## H. K. PORTER COMPANY, INC., AND SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8237-84.     Filed September 29, 1986.

*C. J. Queenan, Jr.*, *W. Henry Snyder*, and *David L. Ketter*, for the petitioner.
*Edward J. Laubach, Jr.*, for the respondent.

### OPINION

CLAPP, *Judge*: Respondent determined deficiencies in petitioner's 1978 and 1979 Federal income tax in the amounts of $105,281 and $745,161, respectively. After concessions, the issue for decision is whether section 332 applies to bar the recognition of gain or loss on the liquidation of H.K. Porter Australia, Pty., Ltd., petitioner's subsidiary.

This case was submitted under Rule 122, Tax Court Rules of Practice and Procedure. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.

Petitioner H.K. Porter Co., Inc., and Subsidiaries is a Delaware business corporation. At the time it filed its petition in this case, petitioner's principal place of business was Pittsburgh, Pennsylvania.

In 1962, petitioner paid $219,336 for all of the outstanding stock of an Australian business corporation which manufactured saws, brake linings, and clutch facings. Peti-

tioner changed the name of the corporation to H.K. Porter Australia, Pty., Ltd. (Porter Australia), and loaned Porter Australia the funds it needed to operate. At all relevant times, petitioner owned all of Porter Australia's outstanding stock.

In 1966, Porter Australia authorized 400,000 shares of $1 par common stock and 1 million shares of $1 par preferred stock. In 1968, it authorized 2 million additional shares of preferred stock.

The preferred stock only had voting rights at meetings convened to wind up the business, reduce its capital, sanction the sale of a business, or consider any question affecting the rights and privileges of the preferred stock. It had a 5-percent, noncumulative dividend, was redeemable, and had a $2,452,000 liquidation preference over the common stock.

In September 1966, and again in December 1968, Porter Australia capitalized loans from petitioner of $1 million and issued to petitioner 896,861 shares of preferred stock on each occasion. In November 1969, it capitalized loans from petitioner totalling $452,000 and issued petitioner 405,380 shares of preferred stock.[1] Porter Australia capitalized the loans because it was unable to "satisfy" the loans in the short term and it wanted to avoid any further claim by respondent that income should be allocated to petitioner by reason of those loans.

The chart below chronologically depicts when Porter Australia authorized/issued its new stock:

| Date | Authorized or issued | Number of shares | | Loans capitalized |
|------|----------------------|------------------|--|-------------------|
| 8/66 | Authorized | 400,000 | (common) | - - - |
|      |            | 1,000,000 | (preferred) | - - - |
| 9/66 | Issued | 896,861 | (preferred) | $1,000,000 |
| 11/68 | Authorized | 2,000,000 | (preferred) | - - - |
| 12/68 | Issued | 896,861 | (preferred) | 1,000,000 |
| 11/69 | Issued | 405,380 | (preferred) | 452,000 |

In October 1978, petitioner's board of directors voted to terminate Porter Australia's operations because they were unprofitable, and dispose of all its assets. In May 1979,

---

[1] The record does not explain why the par value of preferred stock issued does not equal the amount of loans capitalized. We have followed the stipulation of the parties and the difference is immaterial to our conclusion.

pursuant to Australian law, a certified liquidator was appointed to liquidate Porter Australia. In December 1979, petitioner surrendered all of its common and preferred stock in Porter Australia in exchange for a $477,876 liquidating distribution which included $10,288 to satisfy an intercompany receivable. Said distribution was not enough to cover the $2,452,000 liquidation preference of the preferred stock.

As of December 31, 1978, petitioner's adjusted basis in its 182,664 shares of Porter Australia's common stock was $249,981. As of January 1, 1979, petitioner's adjusted basis in its 2,199,102 shares of Porter Australia's preferred stock was $2,425,358.[2]

On its 1978 and 1979 Federal income tax returns, petitioner claimed losses with respect to its Porter Australia stock. In his notice of deficiency, respondent disallowed said losses because "under I.R.C. Sec. 332, no gain or loss is recognized on the receipt of property distributed in complete liquidation of a subsidiary corporation."

Section 332(a)[3] provides that a corporation shall not recognize gain or loss on the receipt of property distributed in complete liquidation of another corporation.

Section 332(b) provides:

SEC. 332(b). LIQUIDATIONS TO WHICH SECTION APPLIES.—For purposes of subsection (a), a distribution shall be considered to be in complete liquidation only if—

(1) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 percent of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends);
* * *

(2) the distribution is by such other corporation in complete cancellation or redemption of all its stock, and the transfer of all the property occurs within the taxable year; in such case the adoption by the shareholders of the resolution under which is authorized the distribution of all the assets of such corporation in complete cancella-

---

[2] Again, the record does not explain why the adjusted basis of the preferred stock is different from the amounts of loans capitalized. We have followed the stipulation of the parties and the difference is immaterial to the conclusion.

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended.

tion or redemption of all its stock shall be considered an adoption of a plan of liquidation, even though no time for the completion of the transfer of the property is specified in such resolution; * * *

Respondent contends that section 332 bars the recognition of petitioner's losses. Petitioner contends that section 332 is inapplicable and cites *Spaulding Bakeries, Inc. v. Commissioner*, 27 T.C. 684 (1957), affd. 252 F.2d 693 (2d Cir. 1958).

In *Spaulding Bakeries*, the taxpayer purchased all the outstanding common and preferred stock of Hazleton Bakeries, Inc. between 1930 and 1946. In 1950, Hazleton Bakeries was liquidated and the taxpayer received the assets distributed in the liquidation. The distributed assets failed to cover the preferred stock's liquidation preference. No assets were distributed with respect to the common stock. On its 1950 Federal income tax return, the taxpayer claimed a worthless stock deduction with respect to the common stock. Respondent disallowed the deduction because of section 112(b)(6),[4] the predecessor of section 332. The sole issue for decision was whether section 112(b)(6) barred the recognition of the taxpayer's claimed losses. Specifically, the issue focused on whether Hazleton Bakeries distributed its assets in complete cancellation or redemption of "all its stock."

In a Court-reviewed opinion, we held that the phrase "all its stock" did not include "nonvoting stock which is limited and preferred as to dividends." 27 T.C. at 688. Thus, Hazleton Bakeries' distribution, which was in respect of only the nonvoting preferred stock, was not a distribution in complete cancellation or redemption of all its stock.

The Second Circuit, in affirming this Court, stated:

The [taxpayer], it seems to us, argues with convincing force that the two classes of stock of Hazleton cannot be treated as though they were but one class, nor can the distribution in respect to the preferred stock

---

[4] Sec. 112(b)(6) of the Internal Revenue Code of 1939 provided that no gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation if—

(A) the corporation receiving such property was * * * the owner of at least 80 per centum of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends) * * * ; and

\*  \*  \*  \*  \*  \*  \*

(C) the distribution is by such other corporation in complete cancellation or redemption of *all its stock*, * * * [Emphasis added.]

be treated as though it were a distribution by Hazleton in respect to *all* its stock, all classes. It is convincingly argued as a matter of law, that there could be no distribution in respect to the common stock until the prior claim of the preferred stock had been satisfied. [252 F.2d at 697; emphasis in original.]

Respondent, in essence, advances two arguments: (1) *Spaulding Bakeries* was erroneously decided and the decision should be reconsidered; and (2) even under the rationale of *Spaulding Bakeries*, section 332 applies.

## *Spaulding Bakeries Reconsidered*

Respondent contends that *Spaulding Bakeries* was erroneously decided because: (1) The phrase "all its stock" was misread as referring to only voting or common stock and not to nonvoting preferred stock; (2) an inappropriate analogy was constructed between preferred stock and indebtedness; and (3) the legislative history suggests that section 332 applies when a liquidating distribution is made on preferred stock only.

### *"all its stock"*

In *Spaulding Bakeries* we stated:

The statute is specific in that there must be a "distribution" in liquidation and the distribution must be "in complete cancellation or redemption of *all its [parent's] stock*." What does the phrase "all its stock" mean? Clearly it means at least 80 per cent of the common or voting stock. Does it also mean to include nonvoting stock which is limited and preferred as to dividends? We think not. The statute specifically excepts such preferred stock from the classes of stock which the parent should own—it could be owned by the parent or outsiders. * * * This means the payment in liquidation, in satisfaction of the preferred stock claim, whether to the parent or outsiders, will be immaterial. * * * Here there was no payment or distribution to the parent after the payment of the preferred stock claim in liquidation. The preferred stock claim captured all of the assets. There was nothing left to distribute to the parent as a common stockholder in the subsidiary. We hold the parent received no distribution in liquidation on its common stock within the intendment of the statute. Petitioner merely received in liquidation, payment of a part of its preferred stock claim—a fact which the statute, in effect, states will be immaterial. [27 T.C. at 688; emphasis added.]

In summary, we held that "its" referred to the parent's stock, i.e., the distribution had to be in complete cancellation or redemption of all the stock the parent owned in the subsidiary. Furthermore, because the parent had to own only 80 percent of each class of stock except nonvoting stock which was limited and preferred as to dividends, any distribution with respect to only the nonvoting preferred stock was "immaterial," i.e., not with respect to all the stock.

We agree with respondent that the phrase "all its stock" might be better interpreted as all *the subsidiary's* stock. Our decision, however, was not based on this analysis alone, and, as discussed below, we are not required to reach a different result.

### *Analogy Between Preferred Stock and Indebtedness*

In *Spaulding Bakeries*, we cited cases which set forth the proposition that where the parent was the sole stockholder and also a creditor of the subsidiary, and the liquidating distribution to the parent was insufficient to satisfy the debt, the parent has both a deductible bad debt and a deductible stock loss. We analogized those cases to the facts in *Spaulding Bakeries*. We concluded that those cases were "authority for the conclusion that nothing was or could be 'distributed' on dissolution to the common stockholders until the full liquidation preference of the preferred stockholders was satisfied." 27 T.C. at 689.

Respondent contends that it was illogical to analogize preferred stock to indebtedness rather than to common stock. We disagree. We previously thought the analogy appropriate; the Second Circuit cited our analogy with approval; and we again find said analogy logical.

We further find that the Second Circuit aptly focused on the importance of priorities on dissolution. It stated, and we hold, that "the respective priorities of indebtedness over preferred and common stock and of preferred stock over common stock must be given full force and effect." 252 F.2d at 697. Here the assets were distributed with respect to the preferred stock. No assets were distributed with respect to the common. Consequently, the distribution was not a distribution with respect to all the subsidiary's stock.

## Legislative History

Respondent contends that Congress orginally passed section 112(b)(6) because (1) the nonrecognition of gain or loss on the liquidation of a controlled subsidiary would encourage simplification of corporate structures, thereby destroying unnecessary holding companies, and (2) in actuality, the parent and subsidiary represent one unitary business venture and unification of such closely connected businesses should not be subject to tax consequences. Respondent further contends that the second reason, the unitary theory, supports him in the present case and cites the dissenting opinion in *Spaulding Bakeries*.

The majority opinion did not adopt the unitary theory in *Spaulding Bakeries*. The dissenting opinion adopted the theory. The Second Circuit concluded that "no help was afforded by a reading of the legislative reports." *Commissioner v. Spaulding Bakeries*, 252 F.2d 693, 697 (2d Cir. 1958).

Respondent gives us no new reason as to why the unitary theory, a theory implicitly rejected or accorded little weight by the Second Circuit and our majority opinion, should control the disposition of this case. He simply points to the dissenting opinion in *Spaulding Bakeries*. Suffice it to say that we are not persuaded. See *Commissioner v. Spaulding Bakeries, supra*.

Respondent also contends that the Senate Finance Committee report accompanying the enactment of the Internal Revenue Code of 1954 reflects congressional intent to minimize the elective features, and hence taxpayer manipulation, of section 332. Specifically, respondent cites a Finance Committee report which stated "Your committee has removed this provision with the view to limiting the elective features of the section." S. Rept. 1622, 83d Cong., 2d Sess. 255 (1954).

The provision referred to above prohibited the parent from selling any part of the subsidiary's stock between the time of adoption of the plan of liquidation and the time of distribution. See sec. 112(b)(6)(A), I.R.C. 1939. If a sale was effected, section 112(b)(6) would not apply. This provision, however, was deleted in 1954 upon the enactment of the Internal Revenue Code of 1954.

We cannot infer from the quoted excerpt, or respondent's purported fear of taxpayer manipulation, that Congress intended the result respondent seeks. See *Granite Trust Co. v. United States*, 238 F.2d 670, 679 (1st Cir. 1956), revg. 150 F. Supp. 276 (D. Mass. 1955). First, we decided *Spaulding Bakeries* in 1957. The Second Circuit affirmed in 1958. Congress has had ample opportunity to address any perceived taxpayer abuse spawned by *Spaulding Bakeries*.

Secondly, a manipulating taxpayer need not rely on *Spaulding Bakeries*. Section 332 has several requirements which can easily be avoided. See, e.g., *Commissioner v. Day & Zimmerman, Inc.*, 151 F.2d 517 (3d Cir. 1945), affg. a Memorandum Opinion of this Court (taxpayer sold stock to avoid 80-percent requirement); *Granite Trust Co. v. United States, supra* (taxpayer made gift and sale of stock to avoid 80-percent requirement).

## Notwithstanding Spaulding Bakeries, Does Section 332 Apply?

Respondent alternatively argues that section 332 applies, even under the rationale of *Spaulding Bakeries*, because: (1) Porter Australia's preferred stock had voting rights and, therefore, the distribution in the present case cannot be considered "immaterial;" and (2) substance prevails over form and, here, petitioner in substance held only one class of stock.

## Porter Australia's Preferred Stock

Respondent focuses on the voting rights of Porter Australia's preferred stock.[5] We need not. We agree that the Second Circuit's analysis was correct in that priorities on dissolution cannot be disregarded. In the instant case, Porter Australia's preferred stock had a liquidation preference. In satisfying that preference, no assets remained to distribute with respect to the common stock. Thus, the distribution was not in cancellation or redemption of *all* its stock.

---

[5] The preferred stock in *Spaulding Bakeries* was treated as nonvoting even though, as in this case, it had certain limited voting rights on matters which affected it.

## Substance Over Form

Respondent contends that the substance of the transaction indicates that petitioner held only one class of stock which, when so viewed, would render Porter Australia's liquidating distribution subject to section 332 even under the rationale of *Spaulding Bakeries*. In support of his position, he states that Porter Australia's preferred stock did not grant petitioner any benefits or privileges that it did not already possess as the only stockholder in Porter Australia.

In *Weiss v. Stearn*, 265 U.S. 242, 254 (1924), the Supreme Court stated:

Questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants; and when applying the provisions of the Sixteenth Amendment and income laws enacted thereunder we must regard matters of substance and not mere form.

In the instant case, petitioner loaned Porter Australia money which Porter Australia needed to operate. Porter Australia capitalized the loans and issued preferred stock in 1966, 1968, and 1969 because it was unable to satisfy the loans in the short term and it wanted to avoid any further claim by respondent that income should be allocated to petitioner by reason of those loans. In 1979, petitioner received the liquidating distribution with respect to its preferred stock.

The preferred stock issued in 1966, 1968, and 1969, approximately 10 years before Porter Australia liquidated, was not "illusory" or part of a financial facade constructed of shuffled papers. Cf. *Gregory v. Helvering*, 293 U.S. 465 (1935) (transaction in form of corporate reorganization was just an elaborate conveyance). Significant consequences attached to petitioner's decision to capitalize the loans. Petitioner capitalized the loans with preferred stock, not common. We need not know why petitioner issued preferred stock instead of common. See *Granite Trust Co. v. United States*, *supra*. What is important here is that Porter Australia authorized and issued preferred stock with specific rights and privileges. Respondent has not argued that those rights and privileges have been ignored and the

record does not suggest such a finding. We find that the preferred stock was exactly what it purported to be—preferred stock.

Respondent cites *Gamman v. Commissioner*, 46 T.C. 1 (1966). In that case, respondent relied on the "so-called thin capitalization cases" to argue that the taxpayer did not qualify as a small business corporation under subchapter S because the taxpayer's loans were actually a second class of stock. Both the analysis and facts are different from those in the present case. Under the facts and circumstances of *Gamman*, we held that the notes were a nullity, constituting neither a true debt obligation nor a second class of stock. Here we find that the preferred stock was real and entitled to be treated in accordance with its terms.

Finally, because we have held that section 332 does not bar the recognition of petitioner's losses, we hold that, based on the record, petitioner is entitled to an ordinary loss of $249,981 in 1978 with respect to the worthlessness of its common stock and a long-term capital loss of $1,957,770 in 1979 with respect to its preferred stock. See sec. 165(a) and (g).

*Decision will be entered under Rule 155.*