CONTINENTAL GRAIN COMPANY, TRANSFEREE OF ALLIED MILLS, INC., AS SUCCESSOR BY MERGER TO ELM CREEK ALFALFA MILLS, INC., ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Continental Grain Co. v. Commissioner
Docket Nos. 34157-84; 34163-84; 34164-84.
United States Tax Court
T.C. Memo 1988-577; 1988 Tax Ct. Memo LEXIS 606; 56 T.C.M. (CCH) 900; T.C.M. (RIA) 88577; December 20, 1988. *606 Held: Petitioner's transferor, Allied Mills, Inc., is entitled to bad debt and worthless stock deductions on the liquidation of Allied's wholly owned subsidiary, Polo Food Products Co., as Polo was insolvent on the date of liquidation; section 332 inapplicable. Howard Smith,Lawrence Weppler, and Richard Bronstein, for the petitioners. Kevin Flynn and Bruce Wilpon, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: By three separate statutory notices, each dated June 28, 1984, respondent *607 determined liability against petitioner, as transferee of Allied Mills, Inc., and predecessor corporations, for the years and in the amounts as follows: Fiscal
Docket
Year
No.
Ended
Transferor
Amount
34157-84
6/30/69
Elm Creek Alfalfa Mills, Inc.
$ 3,781.00  34163-84
1/31/70
Central Nebraska Packing Co.
1,334.00
34164-84
6/30/69
Allied Mills
209,706.01
6/30/72
Allied Mills
743,784.00
The primary issue in this case is whether section 332 [2] applies to the merger into Allied Mills, Inc. (Allied), of its wholly owned subsidiary, Polo Food Products Co. (Polo) on May 31, 1972. Resolution of this issue turns on whether Polo was solvent at the time of the merger. Respondent argues in favor of Polo's solvency, and it is his position that pursuant to section 332 Allied is entitled to recognize no loss for bad debts or worthless securities. Petitioner, relying upon the line of cases ending with H.K. Porter Co. v. Commissioner,87 T.C. 689 (1986), argues that Polo was insolvent at the time of the merger, that consequently section 332 is inapplicable, and that Allied is entitled to such losses. Respondent does not dispute *608 petitioner's legal position; rather the dispute in this case is over the fair market value of Polo's assets and liabilities. Should respondent prevail, petitioner asserts that it is entitled to carryover Polo's net operating losses to its short fiscal year ending March 31, 1973, a year not before the Court and presumably barred by the statute of limitations. Petitioner argues that either the doctrine of equitable recoupment or the mitigation provisions of section 1311 et seq., apply to allow recovery of this item. At trial, the parties agreed with the Court that an additional hearing may be required in the event respondent prevails on the primary issue. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation and attached exhibits are incorporated herein by this reference. Petitioner is a corporation with its main office at 227 Park Avenue, New York, New York. On June 30, 1981, petitioner became the transferee of the assets of Allied through *609 its merger with Allied from which petitioner emerged as survivor. As a result of the merger, petitioner also became transferee of the assets of Central Nebraska Packing Co. and Elm Creek Alfalfa Mills, Inc., which had earlier been merged into Allied. During the years at issue, Allied was a corporation based in Chicago, Illinois, whose principal activity was the manufacture of livestock feeds and poultry products. On November 14, 1969, Allied entered into an agreement with the Magoo Corporation (Magoo) for the purchase of all 200,000 outstanding shares of Polo. The purchase price was $ 1,200,000 cash, a $ 400,000 note, and additional amounts to be paid in subsequent years based upon Polo's earnings. Prior to and as a condition of sale, Magoo made a cash contribution to Polo's capital in the amount of $ 124,000, which redeemed certain of Polo's outstanding indebtedness. Prior to its purchase of Polo, Allied was provided with Polo's certified balance sheet and financial statement as of June 28, 1969, and an unaudited balance sheet and financial statement for the period June 29, 1969, through September 27, 1969. The June 28, 1969, financial statement showed that Polo had a pre-tax *610 loss of $ 196,680 for the 52 weeks ending on that date. In the stock purchase agreement, Magoo warranted no material adverse change in Polo's financial condition, except as disclosed in a letter to Allied dated November 6, 1969. Subsequent to the sale's closing, Allied was to obtain Polo's balance sheet as of November 15, 1969. If Polo's net worth was determined to be less than $ 300,000 on that date, the $ 400,000 note given as payment for Polo's stock was to be reduced on a dollar-for-dollar basis to the extent that the net worth of Polo was less than $ 300,000. Through its two plants located in New Paris, Indiana, and Schaumburg, Illinois, Polo was engaged in the further processing of poultry products, which involved supplying such products to canned and frozen prepared food manufacturers. As Allied's Poultry Division produced broilers and broiler meat in a raw state, the acquisition of Polo represented a natural extension of Allied's business. Polo owned the older New Paris plant which it used mainly for turkey processing. Polo leased the more modern Schaumburg plant from Exchange National Bank of Chicago as trustee under a Trust Agreement dated November 1, 1967. One of *611 the beneficiaries of this trust was Mark Goldberg, who was the president and principal shareholder of Magoo. The lease for the Schaumburg plant, which had been specifically built for Polo and completed not later than July 1, 1969, had an initial term of 21 years running from July 1, 1969, through June 30, 1990, with two 10-year options to renew. The monthly rental on the Schaumburg facility was $ 16,875. On March 9, 1970, a balance sheet and financial statement was prepared for Polo by Richard C. Bevier (Bevier), controller of Allied's Poultry Division. This balance sheet covered the 3-1/2-month period ending February 28, 1970, and showed a pre-tax loss of $ 704,278 for that period. In response to this report, Allied's president, Roy E. Folck sent Charles H. Peterson (Peterson), Allied's Assistant Vice-President, Poultry Division, to Polo's Schaumburg facility to determine the cause for such losses. Upon reaching the Schaumburg facility, Peterson undertook several studies to determine the reasons for Polo's losses. One of the problems experienced at the facility was the high cost of the fowl that constituted Polo's major raw material. Polo's fowl consisted of spent hens from *612 egg laying flocks located primarily in Georgia, Alabama, Mississippi, and Florida. Freight charges were FOB Georgia plus an additional freight charge to the final destination. Therefore, Polo's freight charges were 2 to 2-1/2 cents per pound greater than Polo's competition in Georgia. Given a 30-percent yield, the final cost was increased by 8 to 8-1/2 cents per pound. Moreover, this was not a problem which could be corrected by Allied management. Peterson also thought that Polo needed a very substantial increase in sales volume. In this regard, and with the assistance of Allied's market research department, Peterson undertook a market study, the result of which showed that Polo needed a 108-percent share of the market to break even. This, in Peterson's judgment, was an impossibility. Peterson found a number of problems that could only be solved by moderate to major capital expenditures. While the equipment at the Schaumburg plant was state of the art, the vari-phase cookers employed at the plant contaminated both the chicken fat and chicken broth which could not then be used. Not only did this infirmity result in Polo's inability to sell its chicken broth and fat, but Polo *613 also had to make a major change in its cooking operation to vat hot water systems. Polo was eventually prohibited from using the vari-phase cookers by order of the United States Department of Agriculture. These cookers were eventually removed from the Schaumburg facility, and a claim filed against their manufacturer, who by then was in bankruptcy. No recovery was ever made on this claim. The cookers themselves had to be abandoned as they could not even be sold for scrap metal. The Schaumburg plant also experienced difficulties with a freon freezing system which it leased from Liberty Leasing Co. As Polo's product was put into the freezer's freon bath, the freon picked up contaminants from the product. As the freon became contaminated with bacteria, it would contaminate new product which then did not meet the specifications of Polo's larger customers. This resulted in the loss of those customers. The problems with the freon freezer necessitated its replacement in October 1972, with a nitrogen freezer. On June 13, 1973, Allied paid $ 132,555.97 to be released from the freon freezing system lease. Other difficulties included Polo's problems with the Metropolitan Sanitary District, *614 who on occasion attempted to close the facility. Polo also had trouble with very high labor turnover and ongoing and long-term maintenance and repair problems. Peterson memorialized his conclusions in an October 22, 1970, memorandum to Frank C. Gagen, secretary and house counsel to Allied, recommending that Allied make a claim against Magoo and Goldberg in the amount of $ 929,028.76, alleging a breach of the purchase agreement. As a further result of Peterson's conclusions, Allied hired A.T. Kearney & Co. (Kearney), management consultants, to perform a market survey. From Kearney's final report, Allied's management concluded that it would be difficult for Polo to ever become a successful enterprise. Allied's management then discussed various alternatives, including selling Polo's operations or taking Polo into bankruptcy. The bankruptcy alternative was rejected because of the effect it would have on Allied's banking relations. It was decided to attempt to sell Polo as an entity. The task of finding a buyer for Polo fell to Joe A. Cooper (Cooper), one of Allied's vice-presidents. Cooper contacted at least 22 companies but found no interested purchasers. Prior to this time, *615 Bevier had completed a study of Polo's operations for Allied's Polo Break Even Program. That study noted problems to which losses might be attributed at both of Polo's plants and set forth steps to be taken to bring Polo to the break even point. Among those steps was the purchase of the Schaumburg plant and any leased equipment. On July 15, 1970, Bevier recommended to Paul J. Coolman, then vice president of Allied's Poultry Division, that negotiations be entered into for the purchase of the Schaumburg plant. On May 25, 1971, Peterson was asked by John G. Reed, Jr., then Polo's president, to analyze the possible purchase of the Schaumburg facility, considering the appraised value, fair market value, and the impact of purchase versus lease on Polo's after-tax cash flow and earnings. His results considered his estimate of the Schaumburg facility's fair market value of $ 2 million, allocating $ 450,000 to the underlying land with the remainder to the plant and equipment. Peterson recommended negotiations for the building start at $ 500,000 below the asking price of $ 1,740,617, not to pay a figure higher than $ 1,567,865 so as to take into account claims against Magoo and Goldberg *616 for breach of warranties contained in the stock purchase agreement. This figure, when added to the $ 450,000 cash recommended to be paid for the land, would have amounted to a total purchase price of $ 2,017,865 even though a prior appraisal estimated the value of the property at $ 1,902,417. Allied rejected an offer, in December 1971, to terminate the lease for a payment of $ 500,000 "to provide [the lessor] with a fund to continue to maintain the property until we are able to find another tenant or a buyer." On April 11, 1972, Allied's board of directors authorized the purchase of the Schaumburg land and facilities for $ 1,916,000. On April 14, 1972, Allied entered into an agreement with the Exchange National Bank of Chicago for the purchase of the facility at that price. As part of the purchase agreement, Allied and Magoo and Goldberg executed reciprocal releases of all claims arising out of the Polo stock purchase agreement and Goldberg's employment contract with Allied. As a result of the purchase, Allied became Polo's lessor of the Schaumburg facility. On May 10, 1972, Allied engaged Appraisal Service Company (ASC) to perform an appraisal of all of Polo's assets. These *617 appraisals were submitted on July 25, 1972, and purported to estimate the value of Polo's assets as of June 2, 1972. ASC estimated the value of Polo's assets at the Schaumburg facility at $ 569,835, of which $ 436,470 was attributed to machinery. The land, buildings, and equipment at the New Paris facility were appraised at $ 509,920. From the date of the acquisition of Polo's stock through June 30, 1970, Allied made cash transfers to Polo in the amount of $ 4,048,417. By resolution of Allied's Executive Committee, as ratified by its Board of Directors, $ 4 million of this amount was charged off as a contribution to capital on June 30, 1970. Allied's officers were authorized to draft and execute instruments evidencing the remaining $ 48,417 as debt with interest payable at not less than 4 percent per annum. Such instruments were never drafted nor executed. Over the next 2 years, Allied made further cash transfers to Polo in the form of loans which increased Polo's inter-company debt. This debt decreased from time to time, in part through cash transfers from Polo to Allied and in part by tax benefits which Allied received at the end of each fiscal year from Polo's net operating *618 losses by virtue of filing consolidated returns. On the date of merger, the inter-company debt stood at $ 426,685. On May 31, 1972, Polo was merged into Allied and the lease of the Schaumburg facility was extinguished as a matter of law. In January 1973, Allied engaged Quad Corporation (Quad) to assist in the sale of the Schaumburg facility to another food processor. Quad's efforts met with no success. The assets at Schaumburg, including the land and buildings, were sold to Miles Laboratories in July 1973, for $ 1,950,000, of which $ 50,000 was allocated to machinery and equipment. The assets at New Paris were sold to L.R. Meyer Co. in March 1975, for $ 225,000, with Allied retaining the right to use 250,000 pounds of freezer area and 2,880 square feet of other storage space for a period of 5 years. Allied retained $ 107,000 worth [3] of vehicles and office furnishings from both facilities. OPINION Section 332(a) provides that "No gain or loss shall be recognized on the receipt by a corporation of property *619 distributed in complete liquidation of another corporation." However, section 332 is inapplicable in a case where there is no distribution to the parent corporation on account of its ownership of the subsidiary's stock by reason of its subsidiary's insolvency, "because in such instance there is nothing to distribute in cancellation or redemption of the liquidating corporation's stock." Swiss Colony, Inc. v. Commissioner,52 T.C. 25, 35 (1969), affd. 428 F.2d 49 (7th Cir. 1970). See also H.K. Porter Co. v. Commissioner,87 T.C. 689 (1986); Spaulding Bakeries, Inc. v. Commissioner,27 T.C. 684 (1957), affd. 252 F.2d 693 (2d Cir. 1958). "In determining whether a subsidiary is insolvent for section 332 purposes, the fair market value of its assets is determinative." Swiss Colony, Inc. v. Commissioner,supra at 35. It is well settled that fair market value is "the price at which the property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright,411 U.S. 546, 551 (1973). *620 The determination of fair market value is necessarily one of fact, each case turning upon its particular facts. Messing v. Commissioner,48 T.C. 502, 512 (1967). In such cases, absolute precision is impossible, with some cases capable of resolution only by "Solomon-like pronouncement." Messing v. Commissioner,supra at 512. In this case, absolute precision is not necessary, although the parties have put no small amount of effort into arguing the fair market value of assets no longer in existence as of a date more than 15 years prior to trial. The fair market value of Polo's assets is relevant only to the issue of Polo's solvency; if Polo was insolvent on May 31, 1972, petitioner wins. If Polo was solvent on that date, respondent's determination must be sustained. The parties have reached agreement concerning some assets and liabilities which reduces the number of assets upon which we must place a value. These remaining assets include the value of land, plant and equipment at Polo's New Paris facility, and the value of the machinery and equipment at Polo's Schaumburg plant. There is also a dispute regarding Polo's liabilities as they relate *621 to the lease of the Schaumburg facility, the lease of a freon freezing system, debt owed by Polo to Allied and interest thereon, and an item labeled by petitioner as "incorrect credit to intercompany debt." The dispute as to the fair market value of the assets at New Paris and Schaumburg revolves primarily around the appraisal of those assets submitted by ASC on July 25, 1972, estimating the value of those assets as of June 2, 1972. These appraisals were performed at the behest of Allied, estimating the value of Polo's assets at Schaumburg at $ 569,839 and valuing the land, buildings, and equipment at New Paris at $ 509,920. The crux of petitioner's argument is that ASC greatly overstated the value of these properties, and that their true value on the merger date was equal to the actual sales price of the Schaumburg assets sold in July 1973, and the New Paris assets sold in March 1975. Respondent argues that the ASC appraisals, which were made within weeks of the merger date, are the best evidence of the value of those assets. With one exception, the expert witnesses produced by the parties confined their opinions to the relative merits of the ASC appraisals and the subsequent *622 sales. Only Robert Jones (Jones), who testified on behalf of respondent concerning the value of the machinery and equipment at both Schaumburg and New Paris, undertook to place a fair market value on any of the assets in addition to his analysis of those appraisals. In the valuation area, expert testimony is most helpful to the finder of fact and is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Federal Rule of Evidence 702. Expert testimony, must, however, be viewed in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 494 (1970). We are not bound by expert testimony which is contrary to our judgment, Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court, and may either embrace or reject expert testimony whichever in our judgement is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938). We need not accept an expert's *623 opinion in its entirety, Parker v. Commissioner,86 T.C. 547, 562 (1986), and are not bound to the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner,84 T.C. 722, 734 (1985). We find none of the experts entirely persuasive, and have based our determination of fair market value upon those portions which we deem to be reliable of the experts' analyses of the ASC appraisals, the experts' evaluation of the bases and methods used in preparing those appraisals, and their opinions concerning the propriety of those bases and methods. Land and Buildings at New Paris
ASC valued the land at New Paris using the comparable sales method, making what were thought to be appropriate adjustments to reflect current market conditions, location, size, and other pertinent data. ASC concluded that the proper value to be placed upon the land at New Paris was $ 1,500 per acre for 20 acres which yielded a value of $ 30,000. Petitioner does not seriously dispute the value of the underlying land, and in the absence of persuasive evidence to the contrary, we agree with respondent that such value is reasonable. *624 ASC valued the improvements upon the real property at New Paris using the replacement cost, income, and market data approaches. In utilizing the replacement cost approach, ASC undertook a building-by-building analysis of the replacement cost of each structure. Estimating that each building had a useful life of 40 years, ASC depreciated each building by 2.5 percent for each year of its existence. The resulting figure was discounted 25 percent for functional obsolescence because of the contorted configuration of the structure as a whole, which had been added to as needed since 1947 when plant operation was begun. A further discount of 5 percent was taken into account for economic obsolescence. This approach yielded a value of $ 323,624, which was added to the value of the land as determined by comparable sales as noted above. ASC arrived at an estimated value under the income approach by capitalizing the anticipated net income stream assuming that the property was available for rental on the open market. Using an anticipated net income of 70 cents per square foot, based on what were thought to be comparable rentals, and a capitalization rate of 11.5 percent, the value of the *625 site under this method was determined to be $ 352,000. Using the market data approach, ASC examined what were thought to be the most comparable sales and determined the New Paris plant to be worth $ 6 per square foot, which yielded a fair market value of $ 346,974. ASC's estimates under these two methods included the value of the underlying land. Considering the values computed under all three methods, ASC chose the round figure of $ 350,000 as the value of the 20 acres of land and improvements. All experts agreed that the methods used by ASC were generally accepted as sound by professional appraisers. Nevertheless, petitioner's expert, Charles B. Gates (Gates), was of the opinion that ASC "significantly overvalued" the property at the New Paris site. This opinion was based largely upon the fact that there was no indication that ASC took into account Polo's deteriorating financial condition in making its appraisal. Gates was also of the opinion that a depreciation allowance of 2.5 percent per year per building did not take into account the immediate additional depreciation suffered by a new addition attached to an old building at New Paris. Further, Gates found no basis for *626 limiting the discounts for functional and economic obsolescence to 25 percent and 5 percent, respectively, figures which he thought were conservative. However, Gates agreed that such discounts were to be applied based on the appraiser's judgment after viewing the property and considering the information in his possession at the time of the appraisal. We find the ASC appraisal the most reliable in its estimate of the value of the land and buildings at the New Paris facility. Gates' analysis of the ASC appraisal of these assets consists of no more than questioning the depreciation figures and the discounts for functional and economic obsolescence applied by ASC. We do not think that Gates' questions and reservations about the data underlying ASC's appraisal, which he accepts, is sufficient to prove that appraisal erroneous. Petitioner's expert has merely criticized, and has not provided us with any concrete reasons for adjusting those appraisals nor any alternative to them. It is petitioner who bears the burden of proof, Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a), and we consider Gates' critique of the ASC appraisal little more than second-guessing. *627 We therefore agree with respondent and find that the fair market value of the land and improvements at the New Paris facility on the merger date was $ 350,000. Machinery and Equipment at New Paris and Schaumburg
The experts' analyses of ASC's appraisals of the value of Polo's machinery and equipment at both the New Paris and Schaumburg facility involve two steps. The first of these was the determination of the basis of each of ASC's appraisals. The second step was the determination of whether or not each basis was correct, and if not, the correct basis for valuing those assets. While Jones and Gates did not use identical terminology, we think that they would agree that either going concern value or value-in-use contemplates the continued use of the property in the same or similar line of business. [4] However, they disagreed on the basis used by ASC for its appraisal of the machinery and equipment at the New Paris facility. In his report, Gates cited Polo's deteriorating financial position in support of his opinion that "the [ASC] appraisals should not have evaluated, as they apparently did, the continued use of the machinery and equipment as installed in the subject *628 plants." This statement is consistent with Gates' belief that ASC used either a going concern or value in use basis for its appraisal of the machinery at New Paris. In support of his position, Gates also cited the fact that the estimated remaining useful lives of the equipment found at both plants was the same or similar, that correspondence between Allied and ASC after the appraisal stated that the appraisal was to be on a going concern basis, and that a high proportion of value was assigned to specialized equipment which would have little value outside of the industry. Gates also pointed out in his report that pulpers which were almost identical were assigned much less value at the New Paris plant than at Schaumburg. Jones was of the contrary opinion and believed that the machinery and equipment at New Paris were appraised on the basis of being uninstalled and not in use. His reasons for this opinion were that the Schaumburg equipment was described in ASC's appraisal for that facility as installed *629 whereas there was no such description for the equipment at New Paris. Jones also noted that the New Paris appraisal itself stated that the valuation was on the basis of the plant's being "sold to someone other than a food processor." We agree with respondent with respect to New Paris' machinery and equipment. We find that ASC's appraisals were made on what Jones defined as a market value or orderly liquidation basis with no value attributed to the equipment's installation or integration into a going and profitable concern. We find the factors set forth by Jones more persuasive than those set forth by Gates. Indeed, one of Gates' factors, the discrepancy in value between identical pulpers, is actually supportive of Jones' rationale. We think the similarity of the estimated remaining useful lives is irrelevant; the useful lives of two substantially identical pieces of equipment should not be materially different merely because one is installed while one is not. However, most persuasive is the fact that ASC's New Paris appraisal states that it was made on the basis that the facility "may have to be sold to a user other than a food processor. This would result in some of the plant's *630 special features being of little or no value, thereby resulting in a lower fair market value than would be the case if the plant could be sold to a food processor." We find this statement more persuasive than the correspondence relied upon by Gates, which was initiated by Allied some 7 years after the appraisal. ASC therefore did not take into account any going concern value, and we think that ASC's contemporary appraisal is the most reasonably accurate estimate of fair market value at this late date. [5]
While petitioner argues that the March 1975, sale of the New Paris *631 facility to Meyer is fairly indicative of fair market value, there are aspects of that sale that make it an unreliable measure. Because the sale was nearly 3 years after the date of the merger, it has an inherent measure of unreliability. Finally, Allied retained or negotiated for the right to use 250,000 pounds of freezer space and 2,880 square feet of storage space for 5 years, which would presumably have been worth a substantial sum. As was the case with the land and buildings at New Paris, we find that petitioner has not produced evidence sufficient to show that the ASC appraisal, which respondent has adopted, is erroneous. We therefore accept ASC's estimate of $ 159,920 as the value of the machinery and equipment at New Paris and find the fair market value of the New Paris land, buildings, and equipment to be $ 509,920. We do not reach the same result with respect to the Schaumburg machinery and equipment. Here, Gates and Jones agreed that ASC valued the assets on either a going concern or value in use basis. They also agree that such a basis was improper, Jones stating that had he "been made aware of all the circumstances, [he] would have advised Allied Mills that a *632 going concern valuation was not an appropriate premise of value * * * ." However, respondent in effect attempts to repudiate Jones' opinion by arguing that Allied anticipated Polo's continued operation after their merger and a subsequent sale of Polo's assets as an operating unit. Respondent contends that Polo was therefore a going concern on the date of the merger with the additional value attendant thereto. We think respondent's argument misses the mark. Were this premise to be correct, every money-losing enterprise still in operation would have additional value imputed to it for potential profitability. However, no willing buyer would pay a premium for a money-losing enterprise. We place little weight upon evidence or argument concerning Allied's intent to operate Polo after the May 31, 1972, merger and Allied's hope to subsequently sell Polo as a going concern. Rather, we focus on what we perceive, albeit many years after the fact, to be Allied's ability to do so. In this regard, we believe that statements of intent or desire have little impact upon a willing buyer with knowledge of all relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973). *633 Petitioner argues that the value of the Schaumburg assets should be determined with regard to their sale to Miles Laboratories (Miles) in June 1973. Of the $ 1,950,000 purchase price, which petitioner maintains was the result of arm's-length bargaining, Allied and Miles allocated $ 50,000 to the machinery and equipment. While we have no doubt as to the arm's-length nature of the transaction as a whole, we are not convinced that the $ 50,000 allocated to that machinery and equipment in the July 1973, sale adequately reflects its fair market value on May 31, 1972. Gates' report lends little support to petitioner's position and does little more than state as fact what petitioner states as argument, i.e., that an actual sale is the best indicia of fair market value. The report states that there was no material change in the market from May 31, 1972, through July 1973, and that the sales price and allocation of $ 50,000 to the machinery and equipment were all at arm's length. However, the report contains little in the way of factual support, merely stating that ASC's value estimates of $ 436,470 "must be substantially reduced to reflect realistic liquidation values." We agree with *634 petitioner that undr the facts of this case a subsequent arm's-length sale of the property being valued should be considered. See Estate of Kaplin v. Commissioner,748 F.2d 1109 (6th Cir. 1984), revg. on a factual matter a Memorandum Opinion of this Court. However, petitioner has not convinced us that there were bona fide competing interests between Allied and Miles in the allocation of the purchase price between realty and personalty. Miles did not seek to utilize the plant for the specialized use for which it was built, and neither needed nor wanted the machinery, facts which were known to Allied. The record reflects that Miles initially intended to totally ignore the equipment for tax allocation and even book value purposes. Petitioner falls far short of proving that the fair market value of the Schaumburg machinery and equipment is equal to the allocation agreed to by Allied and Miles. Neither do we agree with respondent that the fair market value of those assets is accurately reflected in the ASC appraisal. While respondent's valuation in allocation of purchase price cases is afforded a presumption of correctness, Fieland v. Commissioner,73 T.C. 743, 751 (1980), *635 we find that the appraisals made by ASC and in Jones' report, both of which are on a going concern or value in use basis, overstate the value of those assets. Jones offered an opinion at trial of both the orderly and forced liquidation values of the Schaumburg machinery and equipment, which he set at $ 369,000 and $ 200,000, respectively. To arrive at his orderly liquidation value, Jones deducted the installation costs and age/life depreciation from the replacement costs of the machinery and further deducted what he felt was the cost to dismantle and remove the equipment from the facility. He arrived at a forced liquidation figure through contact with used machinery and equipment dealers, deducting from the orderly liquidation value the amount that those dealers considered to be a reasonable return on their investment. Forced liquidation is clearly not an appropriate basis for determining fair market value for Federal tax purposes. The term connotes an element of compulsion, which is inconsistent with the requirement of a willing seller. We have held that a sale made under compulsion is not indicative of fair market value even when involving unrelated parties. Duncan Industries, Inc. v. Commissioner,73 T.C. 266, 277 (1979). *636 While the record does not reflect Allied's purchase price for the Schaumburg equipment, nor the equipment's book value [6] on the merger date, the ASC appraisal estimated its value on a going concern or value in use basis at $ 569,835.00, a figure which we would be inclined to accept if we thought such was the correct basis for valuation. We note that on May 31, 1972, the Schaumburg equipment was approximately 4 years old, and we do not think that in June 1973 only 1 year later, the equipment would have depreciated, in an economic sense, to less than 9 percent of its value solely through the loss of going concern value and 1 year's deterioration. Although petitioner argues that there was no change in the market between May 1972 and July 1973, there was a drastic change in Polo's position in the market. Allied's former Polo operations went from a viable although sick business to a defunct enterprise having ceased operations entirely at both of its facilities by March 31, 1973. Polo may have been more highly motivated to dispose of the equipment along with the real property than to attempt to negotiate with separate buyers for a higher price. We find Jones' testimony persuasive *637 and agree with him that the fair market value of the Schaumburg equipment, when estimated on the proper market value/orderly liquidation basis, is $ 369,000, and is more reflective of fair market value than the allocation agreed to between Allied and Miles in July 1973. Lease on Land and Buildings at Schaumburg Facility
Petitioner argues that Polo's lease of the Schaumburg land and buildings was at a rental which exceeded the fair market value. Because of this excess rental, petitioner argues that the lease constituted a liability to the extent of the present value of the amount by which the rent under the lease exceeded the fair market rent. Respondent argues that prior to the merger date, it was Allied's intention to purchase the property and cancel the lease. In support of this fact, respondent points to several intra-corporate memoranda *638 wherein the benefits of purchase versus lease to both Allied and Polo are set forth. In addition, respondent points out on brief "that Polo could not possibly have a post-merger liability on the canceled lease" since it was no longer in existence. We agree that there could be no post-merger liability on the part of Polo, simply because Polo ceased to exist as a separate corporate entity after May 31, 1972. As a result of Polo's merger into Allied, the lease merged with Allied's fee interest in the property and was extinguished. It is also clear that Polo had an obligation to pay rent to an unrelated party prior to April 14, 1972. However, we are not convinced by respondent's argument that merely because the building was acquired by Polo's parent company on April 14, 1972, that Polo was automatically relieved of a burdensome lease. Our examination of other transactions between Polo and Allied convinces us that Polo was expected to live up to its obligations to Allied and that the lease was no exception. Even though Polo was a wholly owned subsidiary of Allied, and the two companies filed consolidated tax returns and financial statements, Allied would surely not have simply offered *639 the facility to Polo without obligation had the merger not have occurred. Respondent has provided us with no reason why the general rule as set forth in Moline Properties v. Commissioner,319 U.S. 436 (1943), should not be followed in this case. In the same sense that a lease can be an asset "when the value of the rights granted thereunder is in excess of the payments and obligations imposed upon the lessee," Polar Ice Cream and Supply Co. v. Commissioner,13 B.T.A. 1054, 1056 (1928), a lease constitutes a liability when the present value of all future payments required under the lease is greater than the fair market rental. Petitioner argues that the Schaumburg lease constituted a liability to Polo of at least $ 500,000. Respondent, citing the report of his expert witness, Peter P. Jackson (Jackson), argues that the fair rental value of the Schaumburg facility was equal to the rental paid under the lease. In making this argument, respondent contends that the building retained its specialized-use character and should be valued accordingly. Petitioner, however, argues that the Schaumburg building has a value only as a general-use facility, the *640 rent for such a facility being far below that for a specialized-use facility. The fair rental value of real property, like the fair market value of a fee interest in such property, is determined by reference to its highest and best use. See Estate of Thompson v. Commissioner,89 T.C. 619, 627 (1987). The definition of highest and best use as adopted by the American Institute of Real Estate Appraisers is: That reasonable and probable use that will support the highest present value, as defined, as of the effective date of the appraisal. Alternatively, that use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and which results in highest land value. The definition immediately above applies specifically to the highest and best use of land. It is to be recognized that in cases where a site has existing improvements on it, the highest and best use may very well be determined to be different from the existing use. * * * Boyce, Real Estate Appraisal Terminology, 107 (1975). We think this definition ought to equally apply to improved real estate in this case. The parties *641 agree that the rent under the lease was approximately $ 3.45 per square foot. Jackson determined that the highest and best use for the Schaumburg facility was in the further processing of poultry products. This opinion is based largely on the configuration of the building and its electrical and drainage capacities. In formulating his opinion that the lease did not constitute a liability to Polo, Jackson also relied upon the fact that, despite the purchase versus lease analysis made by Allied management, no mention was made in any of their correspondence of the burdensome nature of the lease. Jackson also stated at trial that the annual rental under the lease was not an excessive return on the investment of either the original owner or Allied. We agree with petitioner that the fair market rental of the Schaumburg facility is properly determined on the basis of a general use for that facility rather than its use as a further processor of poultry products. Highest and best use, as defined above, considers a property's "reasonable and probable use" taken "from among reasonably probable and alternative uses." That the Schaumburg facility had no probable use as a further processor of *642 poultry products is borne out by the fact that prior to the acquisition of the facility by Allied, efforts were made to sell Polo's operations at New Paris and Schaumburg either separately or together. Solicitations by Allied management generated very little interest in the Schaumburg property and no willing buyers. We find this evidence sufficient to conclude that the facility could probably not have been rented to another further processor of poultry products prior to the date of the merger. We also note that efforts were made subsequent to the merger date to dispose of the New Paris and Schaumburg properties as going concerns, again either separately or together. In January 1973, Allied management engaged Quad Corp. (Quad) to assist in the sale of the Schaumburg facility as a going concern; Quad's efforts were similarly unsuccessful. Further, we do not think that the fact that Allied continued to use the facility for the further processing of poultry products after the merger requires a specialized-use valuation. Allied's financial statement shows that the Schaumburg facility did not operate profitably and was therefore not "financially feasible." We therefore find that the *643 facility is appropriately valued as a general-use facility. Petitioner argues that the lease liability is at least $ 500,000, which is the amount which the facility's lessor would have accepted in December 1971, to terminate the lease. While this figure was based on the lessor's desire to maintain the facility until a new tenant could be found, petitioner argues that the actual liability under the lease was even higher. Petitioner's expert, J. Leonard Caldeira (Caldeira) made various calculations of this liability using rental figures of $ 1.25, $ 1.40, and $ 1.50 per square foot and discount rates of 12, 16 and 20 percent. The resulting figures range from a high of $ 953,693 down to $ 557,866. Jackson agreed at trial that $ 1.25 per square foot was a reasonable rental for a comparable general-use building, and we so find. Respondent has made no argument concerning an appropriate discount rate, choosing instead to rely almost entirely on his position that the lease is not a liability. Because of Polo's financial condition, a high discount rate is appropriate to reflect the risk to which any lender would be subjected. As respondent has not challenged Caldeira's choice of discount *644 rates or final figures, we conclude a 20 percent discount rate is appropriate, and giving deference to Caldeira's figures, find that the lease constituted a liability to Polo in the amount of $ 628,966. Intercompany Debt and Interest
Petitioner argues the existence of two additional liabilities in respect of inter-company debt. The first is interest on inter-company debt in the amount of $ 83,078.94. The second of these is an increase in inter- company debt of $ 470,000 due to what petitioner argues is an erroneous decrease of that debt for tax benefits received by Allied for the 11 months ending May 31, 1972. The parties have stipulated a schedule of inter-company debt showing the balance due Allied at the end of each month beginning on June 30, 1970, through May 31, 1972. That schedule also showed the interest accruing during each of the months and the total interest accrued. The balance in this account reached its peak of $ 2,131,956 at the end of February 1971. Accrued interest for that month alone was $ 7,224.18. It was through cash transfers from Polo to Allied and the reduction of the account for tax benefits received that the balance was reduced to $ 426,685 *645 on the date of the merger. We view respondent's concession that this last amount is valid inter-company debt as a concession of the validity of the method by which that figure was computed. We find no merit in respondent's seemingly inconsistent position; respondent concedes a valid inter-company debt, but recognizes no interest thereon, although one of the hallmarks of valid debt is the right to enforce the payment of interest. Gokey Properties, Inc. v. Commissioner,34 T.C. 829 (1960), affd. 290 F.2d 870 (2d Cir. 1961). We therefore find that petitioner has adequately proven the existence of a liability on the part of Polo for interest on inter-company debt on the date of the merger in the amount of $ 83,078.94. While respondent takes an inconsistent position with respect to interest on inter-company debt, it is petitioner who takes the inconsistent position with respect to the final $ 470,000 credit to that account. On and prior to the merger date, Polo's inter-company debt was reduced on several occasions for "Federal tax benefits" including the $ 470,000 entry on the date of the merger. Petitioner argues that the entry on Allied's books was *646 made after the merger of the two companies and after Polo ceased to exist. The time of actual physical entry is, of course, irrelevant. While the bookkeeping entry was made after the merger, it was a mere reflection of the fact that those tax benefits had accrued prior to the merger date as Polo was accruing losses. Petitioner further argues that even if the constructive payment is viewed as occurring at the time of the merger, it would be viewed by the consolidated return regulations as a contribution by Allied to the capital account of Polo which would be an inappropriate and useless act on the date of the merger. We find petitioner's arguments unpersuasive. Polo and Allied consistently treated the tax benefits generated by Polo's losses as a reduction of Polo's inter-company debt. Petitioner has offered no persuasive reason why the $ 470,000 of tax benefits available on May 31, 1972, should be treated differently from other tax benefits accrued from June 30, 1970, until the date of the merger and which served to reduce the inter-company account. It is well settled that "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has *647 adopted." Bolger v. Commissioner,59 T.C. 760, 767 n. 4. We therefore find that no increase in inter-company debt, as proposed by petitioner, is appropriate. Lease of DuPont Freon Freezer
On August 11, 1969, Polo leased a DuPont liquid freon freezing system from Liberty Leasing Co., Inc. This system proved to be defective in that as the freon washed over Polo's product, it picked up contaminants which it would then deposit on other product. As a result, Polo's product did not meet the specifications of some of its larger customers, which Polo lost. Petitioner argues that the defects in the system lowered its fair rental value; the lease therefore constituted a liability to Polo since the fair rental value of the system was less than the rental under the contract of lease. Petitioner argues that this liability is in the amount of $ 199,113, which is the sum of all the remaining payments under the lease contract as of June 30, 1972. [7] The freezer was finally disposed of on June 13, 1973, when Allied paid $ 132,555.97 to be released from the lease. At that time the sum of all remaining payments was $ 164,347.04. *648 Respondent argues that the lease did not constitute a liability of Polo at the time of the merger. Respondent states, without citation to the record, that the freezer was used by Polo until the closing of the Schaumburg plant in March 1973, or at least until the purchase of a replacement nitrogen freezer in October 1972. However, petitioner argues on brief, also without citation to the record, that Allied continued to pay rent "even though the freezer was not in use," further stating that it "is unclear as to what evidence, if any, respondent has relied in claiming that the freezer was in use for a period of time after Polo's liquidation." We are unable, on this record, to draw a definitive conclusion as to whether the freezing system was in use on or after the date of the merger. It is petitioner's burden to prove that the lease was a liability. Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a). Proof that the system was not in use, even if no more than the statement of a corporate officer, would be evidence in petitioner's favor. The absence of such evidence creates a negative inference. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), *649 affd. 162 F.2d 513 (10th Cir. 1947). We note that a replacement freezer was not purchased for the Schaumburg facility until October 1972. While there may have been other freezers or freezing systems in use at Schaumburg between May and October 1972, we are convinced that the freon freezing system played a major role in that facility's operation, Polo's president, John Reed, calling it "the guts of the Schaumburg factory." We further note that Allied did not pay to be released from the lease until May 1973, after the cessation of operations at Schaumburg. We therefore infer that the freezing system was in use on the date of the merger and was shut down along with the remainder of the Schaumburg operations. Respondent does not dispute that the freezer was problematic, which we view as respondent's concession that the fair rental value of the freezer was less than the rent to be paid under the lease. The amount of that difference is a fact to be proven by petitioner. It is clear that the liability is not so large as petitioner claims. The $ 199,113 claimed by petitioner is the sum of all rental payments due under the lease over its remaining life of 63 months. The *650 maximum liability is the present value of these payments on May 31, 1972. Allied's statement of lease obligations as of June 30, 1972, was stipulated and divides the $ 199,113 gross lease balance into $ 129,224 principal and $ 69,889 interest. The former of these two figures would have been the maximum present value on the date of the merger. This amount could only be recognized as a liability of Polo in the event that the freezing system was totally worthless, not only to Polo, but to any other user, precluding any sublease of the freezer. However, petitioner has not proven that the fair rental value of the freezer was zero, and this could certainly not be the case were the freezer in use on the valuation date. Neither has petitioner proven that the freezer could be used only for the freezing of poultry products, so that it could not be subleased. Rather, the facts and circumstances of this case lead us to believe that the freezing system had some utility to Polo, and later Allied, and that this utility was not an insignificant amount when expressed as a matter of fair rental value. Because petitioner has provided us with no evidence as to the fair rental value of the freezing *651 system on the date of the merger, choosing instead to attempt to convince us of its total worthlessness, we find that petitioner has not carried its burden of proof on this issue; consequently we find that the freezing system lease was not a liability of Polo to be taken into account on the date of the merger. Petitioner has attached to its opening brief a schedule of disputed and undisputed assets and liabilities. Petitioner sets forth Polo's undisputed assets in the amount of $ 860,805 and undisputed liabilities in the amount of $ 612,507. Respondent does not dispute these figures, and the parties on brief set forth almost identical statements of the issues. We therefore construct the following balance sheet for Polo on May 31, 1972: Undisputed assets
$ 860,805  Property (land, buildings,
509,920
and equipment at) New Paris     Machinery and equipment at
369,000
Schaumburg     Total assets
$ 1,739,725
Undisputed liabilities
$ 612,507  Schaumburg lease
628,966
Freon freezer lease
0
Intercompany debt
426,587
Interest on intercompany debt
83,078
Total liabilities
1,751,138
As total liabilities exceeded total assets on the *652 date of merger, we find section 332 inapplicable. Decisions will be entered for the petitioner.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Continental Grain Company, Transferee of the Assets of Central Nebraska Packing Company and Subsidiary, and Allied Mills, Inc. and Subsidiaries, as Successor by Merger to Central Nebraska Packing Company and Subsidiary, docket No. 34163-84; Continental Grain Company, Transferee of the Assets of, and Successor by Merger to Allied Mills, Inc. and Subsidiaries, docket No. 34164-84.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Petitioner conceded at trial that the equipment retained by Allied had a value of $ 107,000, which was the value estimated for that equipment in ASC's appraisal.↩
4. The American Institute of Real Estate Appraisers considers going concern value synonymous with value in use. See Boyce, Real Estate Appraisal Terminology, p. 101 (1975).↩
5. As regards the added weight given a contemporary appraisal, see Sandvik, Inc. v. Commissioner,T.C. Memo. 1986-588; Reeder v. Commissioner,T.C. Memo. 1980-165; Rider v. Commissioner,T.C. Memo. 1971-43. As stated by the Court in A. Arena and Co. v. United States,103 F.Supp 505, 506 (S.D. Cal. 1952): The contemporaneous appraisal made by a competent appraiser, employed for the purpose, is entitled to more credence than the company's own estimate of the value or the appraisals made since, which seek to determine a value sixteen years ago.↩
6. The parties stipulated that the book value of all assets included in the ASC valuation was $ 1,822,872 on May 31, 1972. That figure, however, is not broken down further, either in the stipulation or the remainder of the record, and the parties have not otherwise brought the book value of Polo's Schaumburg assets to our attention.↩
7. Petitioner does not argue that the lease liability on the merger date, May 31, 1972, is different than on June 30, 1972.↩